**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Dawn Lyn C., | |
| Plaintiff, | Civil No. 3:20-cv-00545 (TOF) |
| v. | |
| Kilolo Kijakazi, Acting Commissioner of Social Security,[1] | |
| Defendant. | September 27, 2021 |

## RULING ON PENDING MOTIONS

The Plaintiff, Dawn Lyn C.,[2] appeals the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") rejecting her applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income benefits.  (Compl., ECF No. 1.) She seeks "an order reversing the decision of the Commissioner and ordering benefits or, in the alternative . . .  an order reversing the Commissioner's decision and remanding the case for further administrative proceedings."  (Mot. to Reverse, ECF No. 22 at 1.)  The Commissioner moves for an order affirming the final decision.  (Mot. to Affirm, ECF No. 25.)

---

[1]     When the Plaintiff filed this action, she named the then-Commissioner of the Social Security Administration, Andrew Saul, as the defendant.  (Compl., ECF No. 1.)  Commissioner Saul no longer serves in that office.  His successor, Acting Commissioner Kilolo Kijakazi, is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d).  The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[2]     Pursuant to Chief Judge Underhill's January 8, 2021 Standing Order, this opinion will not disclose the plaintiff's last name.  *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

This is an unusual case. At Step Two of the familiar five-step process for evaluating disability claims, the Administrative Law Judge ("ALJ") found all of the Plaintiff's claimed impairments to be non-severe, including her claimed impairment of major neurocognitive disorder. (R. 15.) This in itself is not extraordinary; ALJs frequently find some or all of a claimant's impairments to be less than severe. But they usually go on to conduct the rest of the five-step process, and often find that the claimant possesses the residual functional capacity to perform work that is available in the national economy. Here, however, the ALJ stopped at Step Two. (R. 23.)

The Second Circuit has held that the Social Security Administration ("SSA") regulation embodying Step Two is "valid only if applied to screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). A sister circuit's Court of Appeals has explained that "because step two is to be rarely utilized as basis for the denial of benefits . . . its invocation is certain to raise a judicial eyebrow." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 361 (3d Cir. 2004). Indeed, the SSA itself has told its adjudicators that "[g]reat care should be exercised in applying the not severe impairment concept," adding that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with" Step Two. Soc. Sec. Ruling ("SSR") 85-28, 1985 WL 56856, at *4 (S.S.A. Jan 1, 1985). "Rather, it should be continued." *Id.*

To be sure, a decision to stop at Step Two – like almost any other decision by an ALJ – is entitled to deference from this Court if it is free from legal error and supported by substantial evidence. Here, however, the decision is neither free from error nor supported by substantial evidence. The Plaintiff's Motion for an Order Reserving the Commissioner's Decision (ECF No. 22) is accordingly **GRANTED IN PART AND DENIED IN PART**; it is **GRANTED** to the extent that it seeks an order vacating the Commissioner's decision and remanding the case for a

rehearing, but **DENIED** to the extent that it seeks an order reversing and remanding the case solely for a calculation and award of benefits.  The Commissioner's Motion for an Order Affirming the Decision (ECF No. 25) is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On June 22, 2015, the Plaintiff applied for Disability Insurance Benefits pursuant to Title II and Supplemental Security Income pursuant to Title XVI.  (R. 12, 81.)  She alleged a disability onset date of April 17, 2016.  (*Id.* at 78, 90*.*)  She listed her medical conditions as COPD, asthma, traumatic brain injury, and depression.  (R. 78, 89.)  The SSA denied her applications and subsequent request for reconsideration.  (R. 137, 149.)  The Plaintiff then requested a hearing before an ALJ.  (R. 167-68.)  ALJ Thomas Merrill held a hearing on December 12, 2018.  (R. 32-58.)  After the hearing, he issued an unfavorable Notice of Decision.  (R. 12-25.)

Following the familiar five-step sequential evaluation process outlined in Section III below, the ALJ determined at Step One that the Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of May 15, 2013.  (R. 14*.*)  Proceeding to Step Two, he found that the Plaintiff had medically determinable impairments of asthma, anxiety, depression, history of substance abuse, and a history of traumatic brain injury.  (*Id*.)  He then concluded, however, that all of these impairments were non-severe.  (R. 15.)  Specifically, he found that the Plaintiff did not have:

> [A]n impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments.

(*Id.*) (citing 20 C.F.R. §§ 404.1521 *et seq.* and 416.921 *et seq.*).  The ALJ did not proceed to the subsequent steps of the sequential evaluation process.  Stopping at Step Two, he determined that the Plaintiff was not disabled from the alleged onset date of April 17, 2016.  (R. 28.)

The Plaintiff requested review of the ALJ's decision by the Appeals Council.  (R. 5-8.)  On February 27, 2020, the council denied review (R. 1-4), and this action followed.  The Plaintiff filed a motion to reverse and/or remand on November 9, 2020.  (ECF No. 22.)  The Commissioner filed his motion to affirm on January 8, 2021.  (ECF No. 25.)  Both motions were accompanied by statements of material facts, with largely overlapping medical chronologies.  (ECF Nos. 23, 25-2.)  The Plaintiff filed a reply brief (ECF No. 25), and the motions are therefore ripe for decision.

## II.    APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'"  *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).  To determine whether a claimant is disabled, the ALJ ordinarily follows a five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity."  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).  At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments."  *McIntyre*, 758 F.3d at 150.  At Step Three, the ALJ then evaluates whether the claimant's disability "meets or equals the severity" of one of the "Listings" – that is, the specified impairments listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404.  *Id.*  At Step Four, the ALJ uses a "residual functional capacity" assessment to determine whether the claimant can perform any of her "past relevant work."  *Id.*  At Step Five, the ALJ assesses "whether there are significant numbers of jobs in the national economy that the claimant

can perform given the claimant's residual functional capacity, age, education, and work experience." *Id.* The claimant bears the burden of proving her case at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error. Put differently, the Court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

If a decision is reversed because it contains legal error or is not supported by substantial evidence, the Court may "either remand for a new hearing or remand for the limited purpose of calculating benefits." *Henningsen v. Comm'r of Soc. Sec. Admin.*, 111 F. Supp. 3d 250, 263 (E.D.N.Y. 2015) (internal quotation marks omitted); *see also Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999) (remanding for rehearing but directing Commissioner "to calculate and dispense SSI benefits" if he could not bear his burden at Step Five). Remand for calculation of benefits is not appropriate when, among other things, the record requires further development. "In deciding whether a remand is the proper remedy, we have stated that where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005). To award benefits, a district court must find that, irrespective of the legal error, the record contains "persuasive proof" of the claimant's disability and "a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). A record contains "persuasive proof" of disability when there is "no apparent basis to conclude" that additional evidence "might support the Commissioner's decision." *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir. 1999).

## III.    DISCUSSION

The Plaintiff raises two principal arguments in support of her Motion for Order Reversing the Commissioner's Decision.  First, she asserts that "[t]he ALJ erred in determining that major neurocognitive disorder is not a severe impairment at Step 2."  (ECF No. 22-1, at 1-8.)  Second, she argues that the ALJ "violated the treating physician rule when he failed to give controlling weight to the opinions of" her neuropsychologists, Drs. Tracey Sondik and Jennifer Caruso.  (*Id.* at 8-10.)  The Court will address the first argument in Section III.A, and the second in Section III.B.  In Section III.C, it will address her request for an order directing the Commissioner to assign her case to a different ALJ on remand.

### A.    Step Two: Plaintiff's Major Neurocognitive Disorder

A Step Two determination requires the ALJ to determine the severity of the plaintiff's impairments.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At this step, the plaintiff carries the burden of establishing that she has one or more severe impairments, and must provide the evidence necessary to make determinations as to those impairments.  *See Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order) (citing *Green-Younger v. Comm'r*, 335 F.3d 99, 106 (2d Cir. 2003)); *Lorusso v. Saul*, No. 3:19-cv-126 (RMS), 2020 WL 813595, at *9 (D. Conn. Feb. 19, 2020) ("The plaintiff bears the burden of establishing that he has a medically determinable impairment, which can be shown by medically acceptable clinical and laboratory diagnostic techniques from an acceptable medical source.") (quotation marks and brackets omitted).  "If a claimant demonstrates the existence of a medically determinable impairment, he then 'bears the burden of presenting evidence establishing severity.'"  *Young v. Saul*, No. 19-CV-331F, 2020 WL 5814456, at *4 (W.D.N.Y. Sept. 30, 2020) (quoting *Taylor v. Astrue*, 32 F. Supp.

3d 253, 265 (N.D.N.Y. 2012)), *report and recommendation adopted*, 32 F. Supp. 3d 253 (N.D.N.Y. 2012)).

"Rather than defining the term 'severe impairment,' the regulations define a 'non-severe impairment.'" *Larkin v. Astrue*, No. 3:12-cv-0035 (WIG), 2013 WL 4647243, at *5 (D. Conn. Apr. 29, 2013), *report and recommendation adopted in part, rejected in part,* No. 3:12-cv-35 (MPS), 2013 WL 4647229 (D. Conn. Aug. 29, 2013). "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), 416.922(a); *see also* Social Security Ruling ("SSR") 96–3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996). Impairments that are "not severe" must be only a slight abnormality that has no more than a minimal effect on an individual's ability to perform basic work activities. *Id.* at *1. Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1522(b), 416.922(b).

The purpose of the Step Two severity analysis is to screen out only the weakest claims. "[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre*, 758 F.3d at 161. Indeed, the Second Circuit has held that the use of Step Two to screen out more than *de minimis* claims would be an invalid exercise of the authority given to the SSA by Congress under the Social Security Act. *Dixon*, 54 F.3d at 1030 (holding that "the severity regulation" embodied in Step Two "is valid only if applied to screen out *de minimis* claims"). As noted above, the SSA itself has warned its adjudicators that "[g]reat care should be exercised" in dismissing claims at Step

Two, and instructs them that if they have any doubt, "the sequential evaluation process should not end with" that step.  SSR 85-28, 1985 WL 56856, at *4.  In summary, "[t]he standard at step two is quite low," *O'Connor v. Saul*, No. 1:18-CV-00740 CJS, 2020 WL 1242408, at *3 (W.D.N.Y. Mar. 16, 2020), and the "claimant has a minimal burden at step two as the severity regulation is designed to eliminate only clearly insubstantial claims."  *Serrano v. Astrue*, 645 F. Supp. 2d 64, 66 (D. Conn. 2009).  Given the low standard, ending the disability determination process at Step Two "is certain to raise a judicial eyebrow."  *McCrea*, 370 F.3d at 360-61.

Of course, a decision to reject a claim at Step Two is like almost any other ALJ decision in that it is entitled to deference from this Court if it is free from legal error and supported by substantial evidence.  *Cf. Shaw*, 221 F.3d at 131.  And the substantial evidence standard is itself deferential.  *Stonick v. Saul*, No. 3:19-cv-1334 (TOF), 2020 WL 6129339, at *3 (D. Conn. Oct. 19, 2020).  But "deferential" does not mean meaningless, and "substantial" does not mean a mere scintilla.  To the contrary, the substantial evidence standard requires "such relevant evidence as a reasonable mind might accept to support a conclusion."  *Lamay*, 562 F.3d at 507.

Combining Step Two's *de minimis* standard with the substantial evidence standard yields the principle that the Court will apply here.  The ALJ's decision to reject the Plaintiff's claim at Step Two should be affirmed if there is sufficient evidence in the record – of the sort that a reasonable mind might accept – for the proposition that the Plaintiff's claim of major neurocognitive disorder is a *de minimis* or "clearly insubstantial" one, and reversed if there is not.

The record that was before the ALJ included the following information.  At the time of the hearing, the Plaintiff was a fifty-nine-year-old woman with a history of traumatic brain injury.  (*See* R. 14) (listing "history of traumatic brain injury" among the Plaintiff's medically determinable impairments).  The record was unclear about whether she sustained the injury in

1989, 1990 or 1991, and about whether she sustained it in a fall or a car accident.  (R. 16.)  In any event, she underwent a brain MRI on December 8, 2015, and that examination showed "changes within the bilateral frontal lobes and left temporal lobe, likely related to sequela of prior traumatic brain injury."  (R. 568.)  On February 23, 2016, Clinical Neuropsychologist Jennifer A. Caruso, Psy. D., performed a neuropsychological evaluation, administering eight separate cognitive ability tests, finding that the Plaintiff exhibited moderate to severe cognitive impairments.  (R. 590-95.) Dr. Caruso recommended, among other things, a referral to an Acquired Brain Injury ("ABI") Waiver Program, stating that:

> If not already initiated, consultation with a DSS Case Manager is advised in order to obtain ABI Waiver Program services.  Specifically, Ms. C[.] meets criteria based on her need for prompting/cueing to perform basic activities of daily living (including dressing, bathing, handwashing, etc.), as well as her need for assistance with appointment planning, cooking/meal planning, and financial management (having previously had a financial conservator).  She demonstrates significantly impaired cognition as described above.  While Ms. C[.] is also experiencing mood/behavioral difficulties (i.e., depression, anxiety, irritability, angry outbursts, child-like behaviors, lack of motivation, and impaired judgment/reasoning) it is important to recognize that these difficulties reflect direct neurobehavioral sequelae associated with her acquired brain injuries (i.e. recent MRI findings demonstrating the presence of significant gliosis/encephalomalacia of the bilateral frontal lobes and left temporal lobe.)  It is imperative that Ms. C[.] be included on the ABI Waiver list as soon as possible.

(R. 594 (emphasis in original).)  Dr. Caruso further stated that with regard to employment,

> Ms. C[.]'s current evaluation revealed a pattern of cognitive and behavioral deficits that are consistent with the brain-related changes observed on MRI and that likely reflect the longstanding sequelae associated with her history of severe traumatic brain injury.  These deficits would be expected to have an impact on her ability to be competitively employed and would lend support for her pursuit of disability.

(*Id.*)

The records of the Plaintiff's treatment with the Department of Social Services' ABI program contained additional information about the effect of her impairments on her ability to do basic work activities.  On or about January 2017, the Plaintiff was approved to receive the

following services: companion, Independent Living Skill Trainer ("ILST"), and Pre-Vocational/Supported Employment to assist her with activities of daily living and supported employment. (R. 792.) Home-based services provided through the ABI Waiver Program included weekly medication management through the Visiting Nurses Association, individual therapy with an APRN, therapy with Dr. Sondik, an ILST each morning for two hours Monday through Friday with some weekend hours, and a companion from 5:00PM to 7:00PM to assist with activities of daily living such as cooking, showering, dressing, medication management, appointment planning and scheduling, cleaning and laundry. (R. 793, 835, 842, 844, 848, 853.)

The record also contained information from Dr. Sondik, who began treating the Plaintiff in February 2017. (R. 820-24, 831-79.) In a letter dated March 12, 2018, Dr. Sondik stated, among other things, that:

> Both MRI imaging and neuropsychological testing have confirmed that [the Plaintiff] sustained significant cognitive impairment including problems with memory impairment, attention, concentration, word-retrieval, processing speed, and mental efficiency. She also experienced personality-related changes due to her TBI including depression and anxiety.
>
> Ms. C[.] has been receiving home based services in her apartment to help her with her activities of daily living including cooking, showering, dressing, and medication management. She needs help in all these areas due to her cognitive difficulties, particularly around her memory. She also has a conservator of both person and estate to help her with her decision-making around her health care, money management, and overall safety and well-being.
>
> In my opinion, Ms. C[.] is permanently disabled with significant cognitive impairment due to her traumatic brain injury and will require services for the rest of her life to ensure her overall safety and well-being.

(R. 793.)

To be sure, the record also contained contrary information. As the ALJ observed, several treatment notes record the Plaintiff as being "neurologically intact, alert, fully oriented, pleasant, cooperative, and with normal memory, attention span, and concentration." (R. 17, 18, 19, 21, 22.)

11

Other notes recorded that the Plaintiff was living on her own; was happy and doing well; worked part time; and maintained a medical appointment calendar.  (R. 17-22; *see also* R. 17 (stating that First Choice Health Center treatment records showing that "mental status examinations … remain at odds with purported dire mental health and cognitive symptoms").)  And the Plaintiff scored thirty out of thirty on a mini-mental state examination, or "MMSE," in November 2015.  (R. 17-21.)

Although weighing the supporting and contrary evidence is the ALJ's province, the Court is tasked with ensuring that his decisions are supported by substantial evidence.  Performing that task requires consideration of any reasons to suppose that the "contrary" evidence is not truly contrary.  *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.")  With respect to the treatment notes about "living on her own" and "doing well," the record is replete with evidence that, after the Plaintiff was admitted to the ABI program, she received highly structured supervision of her activities of daily living, supported employment, medication management, and assistance scheduling and keeping track of appointments.  With respect to the MMSE result, the same physician who administered the test recorded an impression of "[c]ognitive disturbance," the "[p]ossible late effects of traumatic brain injury."  He was concerned enough about dementia to order blood work and a brain MRI, and he wrote that the Plaintiff "may benefit from neuropsychological testing to better understand [the] nature and extent of [her] cognitive disturbance."  (*Id.*)  (R. 565.)

The ALJ discounted the Plaintiff's December 2015 brain MRI and claimed history of traumatic brain injury, but he did so for reasons that were not within his ken.  It is axiomatic that, "[b]ecause ALJs are not doctors, they ordinarily cannot translate diagnoses, medical test results

and the like into functional, vocational terms without the aid of a medical provider's insight into how the claimant's impairments affect or do not affect her ability to work, or her ability to undertake her activities of daily life." *Robles v. Saul*, No. 3:19-cv-01329 (TOF), 2020 WL 5405877, at *4 (D. Conn. Sept. 9, 2020) (quoting *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) (summary order)) (quotation marks and brackets omitted). In this case, the radiologist reading the brain MRI found that "[t]here is a gliosis and encephalomalacic changes within the bilateral frontal lobes and the left temporal lobe, likely related to sequela of prior traumatic brain injury." (R. 568.) The Plaintiff's neuropsychologist, Dr. Caruso, then administered cognitive function tests and concluded that the functional limitations she observed were "generally consistent with findings on neuroimaging demonstrating the presence of gliosis and encephalomalacia within the bilateral lobes and left temporal lobe, and likely reflect the longstanding neurocognitive sequelae associated with her history of severe brain injury." (R. 593.) The ALJ nonetheless concluded that the Plaintiff had no severe impairments, in part because a psychologist testified that the MRI showed nothing "acute." (R. 17.) But it is not within an ALJ's province to translate a finding of "not acute" into a conclusion that the Plaintiff's impairments are non-severe. *Cf. Jelliffe v. Astrue*, No. 5:11-CV-89, 2012 WL 2047497, at *4 (D. Vt. Mar. 7, 2012), *report and recommendation adopted*, No. 5:11-CV-89, 2012 WL 2047499 (D. Vt. June 4, 2012) ("Although the record does indicate that Jelliffe initially had a good physical recovery from his 1974 accident and consequent surgery . . . , substantial evidence does not support the ALJ's finding that Jelliffe suffered no long-term cognitive dysfunction or intellectual deficits during the alleged disability period.").

In substance, the ALJ concluded that because the Plaintiff's head trauma occurred (if at all) long ago, it was not a severe impairment because she had worked and raised a family in the

meantime.  (R. 17.)  He noted that "the alleged injury and surgery occurred in 1989, 1990, or 1991," but "[t]he claimant worked . . . [in] 1996-2002, 2006 [and] 2007 . . . and through 2008 while raising a family, which appears in contrast to her professed long-standing diminished level of mental capacity."  (*Id.*)  But this assumes that a temporally-remote neurological injury cannot worsen and become disabling over time, and in this case, that assumption was not supported by any medical opinion or other substantial evidence.  *Cf. Jelliffe*, 2012 WL 2047497, at *4.

The Commissioner argues that the Plaintiff's inability to produce medical records from her long-ago brain injury weighs in favor of affirmance.  (ECF No. 25-1, at 4-5.)  Beginning with the unobjectionable proposition that claimants "have to prove . . . that [they] are . . . . disabled" (*id.* at 4) (quoting 20 C.F.R. §§ 404.1512(a), 416.912(a)), the Commissioner cites *Reynolds v. Colvin,* 570 F. App'x 45, 47 (2d Cir. 2014) for the proposition that "[a] lack of supporting evidence on a matter where the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits." But *Reynolds* is inapposite here.  In that case, the plaintiff claimed to have been disabled by neck pain from 2001 to 2006, but the ALJ rejected her claim, noting that she "failed to complain of, or seek treatment for, serious neck and back pain until 2010."  *Id.*  On appeal to the Second Circuit, the plaintiff argued that the ALJ erred in ignoring medical records showing such complaints in 1989 and 1991.  *Id.*  But the Court of Appeals disagreed, because those records "were generated more than a decade prior to the relevant period."  *Id.*  In other words, in *Reynolds* the claimant wanted the ALJ to consider records from *outside* the relevant period in determining whether she was disabled *within* that period.  That is not the case here.

In this case, the Plaintiff's inability to provide medical records dating to 1989 is not relevant to her claimed period of disability.  (ECF No. 25-1 at 8.)  She filed her application for disability

benefits on June 22, 2015, alleging a disability onset date of May 15, 2013.  (R. 78, 81.)  The Plaintiff does not bear the burden to prove that her impairments arose out of a particular traumatic event, only that she was disabled during the period claimed.  It is not relevant to the ALJ's consideration of disability benefits whether medical records dating to 1989 were obtained and made part of the administrative record to support Plaintiff's neurocognitive impairment during the disability period under review.  *See Jelliffe*, 2012 WL 2047497, at *4 (remanding for further consideration where ALJ found at Step Two that "Jelliffe's TBI was 'non-severe' because there was 'no indication that [Jelliffe's 1974 depressed skull fracture] caused any long-lasting cognitive dysfunction," where evidence of record demonstrated that although claimant initially "had a good physical recovery from his 1974 accident and consequent surgery … substantial evidence does not support the ALJ's finding that Jelliffe suffered no long-term cognitive dysfunction or intellectual deficits *during the alleged disability period*" ) (emphasis added)).

Viewing the record in its entirety, and considering the "low," *de minimis*" standard that applies here, the Court concludes that the ALJ's decision to reject the Plaintiff's claim at Step Two is not supported by substantial evidence.  The case will be remanded for further administrative proceedings, as discussed further in Section IV below.

### B.      Evaluation of Opinion Evidence

The Plaintiff next argues that the ALJ erred in evaluating her medical opinion evidence. (ECF No. 22-1, at 8-11.)  Specifically, she claims that the ALJ breached the treating physician rule when assessing the weight to be accorded to the opinions of her two neuropsychologists.  (*Id.* at 8.)  The ALJ gave "no weight" to Dr. Sondik's March 12, 2018 letter (R. 22), and "little weight" to Dr. Caruso's February 23, 2016 neuropsychological evaluation.  (R. 20.)

The treating physician rule provides that a treating source's opinion on the nature or severity of a claimant's impairments will be given controlling weight when it is well-supported by, and not inconsistent with, other substantial evidence in the record.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[3]  When a treating physician's opinion is not controlling, the ALJ must consider several factors in determining how much weight it should receive.  *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *Burgess*, 537 F.3d at 129.  Those factors include "(1) the [frequency], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); 20 C.F.R. § 404.1527(c)(2).  After considering these factors, the ALJ is required to "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).  In so doing, the ALJ must provide "good reasons" for the weight assigned.  *Burgess,* 537 F.3d at 129.  While the ALJ is not required to "slavish[ly] recit[e] each and every factor where [his] reasoning and adherence to the regulation are clear," *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013), a failure to provide good reasons for the weight given to a treating source's opinion is grounds for remand.  *Halloran*, 362 F.3d at 33.

On March 12, 2018, treating clinical neuropsychologist Dr. Sondik provided an opinion stating that Plaintiff "sustained a severe traumatic brain injury in 1989" and that "[b]oth MRI imaging and neuropsychological testing have confirmed that she sustained significant cognitive impairment including problems with memory impairment, attention, concentration, word-retrieval,

---

[3]     The treating physician rule embodied in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) applies to this case because the Plaintiff filed her disability claim before March 27, 2017.  (*Id.; see also* R. 79.)

processing speed, and mental efficiency" and "experienced personality-related changes due to her TBI including depression and anxiety." (R. 793.)  Dr. Sondik described the home-based services provided to Plaintiff to assist her with activities of daily living "due to her cognitive difficulties, particularly around her memory" and stated that the appointment of a conservator of both her person and estate was necessary to assist her "with her decision-making around health care, money management, and overall safety and well-being." (*Id.*)

The ALJ gave these and other opinions "no weight" (R. 22), but he did not apply all of the *Burgess* factors.  In particular, his decision did not address the first factor – the "frequency, length, nature, and extent of treatment."  Dr. Sondik saw the Plaintiff twenty-six times between February 2017 and August 2018, and the ALJ's opinion does not analyze whether such intensive and lengthy treatment gave Dr. Sondik additional, longitudinal perspective that the other experts lacked.  And he failed to address the fourth factor when he failed explicitly to consider whether Dr. Sondik's specialty entitled her opinions to additional weight.  (R. 22.)

Of course, an ALJ is not obliged to give a "slavish" recitation of the *Burgess* factors, as noted above.  While "[a]n ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight" is ordinarily "a procedural error," courts will often excuse that error if "'a searching review of the record'" confirms "'that the substance of the treating physician rule was not traversed.'" *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian*, 708 F.3d at 419-20, and *Halloran*, 362 F.3d at 33).  In *Stonick v. Saul*, for example, an ALJ accorded little weight to a treating orthopedist's opinion that the claimant could sit or walk for no more than an hour at a time.  2020 WL 6129339, at *6.  She did not explicitly reference the *Burgess* factors, but this Court nevertheless affirmed her decision, because the record was replete with objective medical evidence confirming that the claimant was not so limited.  *Id.* at *6-7.  "Though the ALJ did not explicitly

17

consider the *Burgess* factors when reviewing [the orthopedist's] medical source opinions, a 'searching review' of the record shows that her decision was supported by 'good reasons' and that 'the substance of the treating physician rule was not traversed.'" *Id.* at *7 (quoting *Estrella*, 925 F.3d at 96).

In this case, the Court is not prepared to say that the ALJ documented "good reasons" for according "no weight" to Dr. Sondik's opinions.[4]   The ALJ stated that the doctor's supporting notes "are clinically lacking" because, among other things, they merely "report the claimant's subjective statements of her routine activities." (R. 22.)  But in the psychological context, courts have not typically regarded this as a "good reason" for entirely discounting a treating opinion, because "any psychological examination could be said to suffer from this criticism." *Thompson v. Berryhill*, 722 F. App'x. 573, 581 (7th Cir. 2018).  Discounting an opinion that emerges from such an examination "ignores that the subjective report is not simply transcribed; it is filtered through the psychologist's training and judgment." *Id*. ("[T]he ALJ's statement is inconsistent with the rule of law that opinions derived from subjective reports are not automatically suspect."); *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015) (noting that giving subjective statements zero weight is fundamental error).  "Like a medical doctor evaluating physical pain, a psychologist must start with the patient's description of her own experience; this is not a defect." *Id.*

The ALJ also discounted Dr. Sondik's opinion because her supporting notes used "imprecise statements" like "supportive therapy" and "development of team approach" (R. 22), but the Court is not prepared to say that this is a good reason either.  When an ALJ concludes that

---

[4]     That is, all of Dr. Sondik's opinions *except* her opinion that the Plaintiff "is permanently disabled." (R. 793.)  The Social Security regulations expressly reserve the question of "whether [the claimant] meet[s] the statutory definition of disability" to the Commissioner, and do not require an ALJ to "give any special significance to the source of an opinion" on that ultimate question.  20 C.F.R. §§ 404.1527(d), 416.927(d).

a treating provider has been unclear, the general approach is not to reject the opinion entirely, but rather "to seek out more information from the treating physician and to develop the administrative record accordingly." *Corbeil v. Colvin*, No. 12-cv-0114 (MAT), 2015 WL 1735089, at *7 (W.D.N.Y. Apr. 16, 2015). If, after rehearing, the ALJ assigns less-than-controlling weight to this or any other opinion from Dr. Sondik, he shall provide a more fulsome explanation of his reasons for doing so.

The ALJ also assessed "little weight" to the February 23, 2016 neuropsychological evaluation from Dr. Caruso. (R. 590-95.) The Plaintiff argues that the ALJ's decision to give Dr. Caruso's neurocognitive evaluation "little weight" was error. (ECF No. 22-1, at 8-11.) Her argument consists of two parts. First, she asserts that the ALJ "failed to consider that Dr. Caruso is a neuropsychologist who administered eight cognitive tests: TOMM, Wechsler Memory Scale-3rd Edition (Orientation subtest), Wechsler Test of Adult Reading, Wechsler Adult Intelligence Scale-4th Edition (Similarities and Matrix Reasoning subtests), Repeatable Battery for the Assessment of Neuropsychological Status-Form A, Clock Drawing Test, Trail Making Test-Parts A & B, Beck Anxiety Inventory, and the Beck Depression Inventory-2nd Edition." (*Id.* at 11; R. 827.) Second, she argues that, "as a lay person" the ALJ is not competent "to substitute his own opinions for a medical specialist" such as Dr. Caruso. (ECF No. 22-1 at 11.) And as an abstract legal proposition, the Plaintiff is certainly correct that an ALJ "is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him" or to "engage[ ] in his own evaluations of the medical findings." *Burgess*, 537 F.3d at 131 (quoting *Balsamo v. Chater*, 142 F.3d 75, 81(2d Cir. 1998)).

The Commissioner argues that the ALJ appropriately weighed Dr. Caruso's neuropsychological evaluation and contends that Dr. Caruso is not a treating provider, as she

provided a one-time neuropsychological evaluation.  (R. 25-1 at 13 (citing R. 20, 590-95).)  It is true that Dr. Caruso's neurocognitive evaluation is non-treating opinion evidence, since she only provided one evaluation.  As a clinical neuropsychologist, Dr. Caruso is an "acceptable medical source" under the regulations, 20 C.F.R. § 404.1502(a)(2); SSR 06-03P, 2006 WL 2329939, *1 (S.S.A. Aug. 9. 2006), and her neuropsychological evaluation is a "medical opinion" if not a treating opinion.  20 C.F.R. §§ 404.1527(a)(1); 416.927(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").  The regulations dictate that "[r]egardless of its source, we will evaluate every medical opinion we receive."  20 C.F.R. §§ 404.1527(c); 416.927(c).  The amount of weight to give such opinions is based in part on the examining and treatment relationship, length and frequency of the examinations, the extent of relevant evidence given to support the opinion, consistency with the record as a whole and the specialty of the treating source.  20 C.F.R. §§ 404.1527(c)(1-7); 416.927(c)(1-7).

The ALJ cited several reasons for giving "little weight" to Dr. Caruso's opinions.  First, he noted that "the claimant scored 30/30 on the MMSE, indicative of no cognitive impairment, three months earlier."  (R. 20.)  He also observed that "Dr. Caruso did not discuss the discrepancy between that normal [test result] and the claimant['s] performance three months later" at the neuropsychological evaluation.  (*Id.*)  Additionally, he discounted Dr. Caruso's report because it "made no mention of the lack of evidence of any alleged prior brain surgery, or that there were no acute findings."  (R. 20-21.)  He also pointed out that Dr. Caruso did not provide the actual "test scores and the validity of the testing scores" in her report.  (R. 21.)  And he also regarded Dr. Caruso's opinions as inconsistent with other "[t]reatment providers," who – in his view –

"consistent[ly] observe[d] the claimant to present as neurologically intact, alert, fully oriented, pleasant, cooperative, and with normal memory, attention span, and concentration, well into 2017." (*Id.*)

As with Dr. Sondik's opinions, the Court is not prepared to say that the ALJ articulated sufficiently "good" reasons for the weight he assigned to Dr. Caruso's opinions.  With regard to his first point – the inconsistency of the opinion with the later MMSE score – the appropriate course of action would have been to ask Dr. Caruso to explain it.  *Cf. Corbeil*, 2015 WL 1735089, at *7 (stating, in the context of treating opinions, that the proper way for an ALJ to resolve ambiguities is to "seek out more information").  As to the doctor's alleged failure to "mention . . . the lack of evidence of any alleged prior brain surgery, or that there were no acute findings on the MRI," the Court notes that Dr. Caruso did describe the results of the MRI accurately.  (*Compare* R. 591 (report of Dr. Caruso, recounting that "an MRI of the brain . . . revealed gliosis and encephalomalacia . . . [and] small vessel ischemic changes") *with* R. 570 (MRI report documenting same).)  Her failure to mention the lack of evidence of prior brain surgery or of acute changes may only reflect that she did not accord these facts the same significance that the ALJ would accord; here too, the ALJ could have asked her to explain it.  He likewise could have asked her to provide the test scores underlying her evaluation, along with any validity measurements or margin-of-error calculations.  In any event, her evaluation report does clearly list the eight tests administered, and it contains an analysis of the test results based on her training as a neuropsychologist.  (R. 591-93.)

The ALJ's fourth reason for discounting Dr. Caruso's opinion was a perceived inconsistency with the treatment notes documenting a "normal"-seeming claimant.  (R. 21.)  It is true that there are many such notes in the record, but the Court notes that they were generally not

made by a specialist in the field of neuropsychology; many were made by internists and other medical professionals who arguably would not be looking for the same things or asking the same questions. (*E.g.*, R. 614-15 (report stating that Plaintiff was "no[t] depressed," "feeling well," and displaying the "full range" of psychological "mood/affect," but completed by internist's physician's assistant).) As with Dr. Sondik's opinions, on remand the ALJ shall provide a more fulsome explanation of his reasons for the weight that he assigned to this or any other opinion from Dr. Caruso.

### C.     Request to Transfer the Case on Remand to Another ALJ

Finally, the Plaintiff requests that the Court remand this case to a different ALJ, asserting that "[t]his ALJ has manifested a lack of fairness to Plaintiff, giving rise to serious concerns." (ECF No. 22-1 at 12-13.) The Court declines to issue such an order. The record does not show that the ALJ's behavior, in the context of the whole case, was biased, impartial or "so extreme as to display clear inability to render fair judgment." *Valentin v. Colvin*, No. 3:16-CV-245 (MPS), 2017 WL 923903, at *3–4 (D. Conn. Mar. 8, 2017).

"The decision to remand a Social Security case to a different ALJ is generally reserved for the Commissioner." *Card v. Astrue*, 752 F. Supp. 2d 190, 191 (D. Conn. 2010) (*citing Dellacamera v. Astrue*, No. 3:09CV1175(JBA), 2009 WL 3766062, at *1 (D. Conn. Nov. 5, 2009)). A court "may interfere with the Commissioner's decision only upon a showing of bias or partiality on the part of the original ALJ." *Id.* A court "must start . . . from the presumption that the hearing officers . . . are unbiased." *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S. Ct. 1665, 1670, 72 L. Ed. 2d 1 (1982). "[T]he burden of establishing a disqualifying interest rests on the party making the assertion." *Id.* at 196.

22

Following these principles, courts in the Second Circuit typically "refrain from directing the Commissioner to assign a different ALJ on remand." *Valentin,* 2017 WL 923903, at *3–4 (quoting *Chandler v. Soc. Sec. Admin.*, 2013 WL 2482612, at *12 (D. Vt. June 10, 2013)); *Dellacamera*, 2009 WL 3766062, at *1; *Johnson v. Astrue*, No. 3:10-CV-1023 (VLB), 2011 WL 2938074, at *3 (D. Conn. Feb. 15, 2011) (same), *report and recommendation adopted*, No. 3:10-CV-1023 VLB, 2011 WL 2936398 (D. Conn. July 19, 2011).  Factors the Court may consider in determining whether to order reassignment include:

> (1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party.

*Card*, 752 F. Supp. 2d at 192 (citing *Sutherland v. Barnhart*, 322 F.Supp.2d 282, 292 (E.D.N.Y. 2004)); *see Jordan v. Berryhill*, No. 3:18-CV-384 (KAD), 2019 WL 1429616 (D. Conn. Mar. 29, 2019) (applying *Sutherland* factors); *Johnson,* 2011 WL 2938074, at *3 (same); *Dellacamera*, 2009 WL 3766062, at *1 (same).

In this case, the Plaintiff cites three principal reasons for her request that the case be reassigned.  First, she says that ALJ Merrill "showed a lack of judicial candor" in the way that he discussed the hearing testimony of an impartial psychologist, Dr. Nicole Martinez.  (ECF No. 22-1, at 12-13.)  His decision refers to her as an "expert," and relies on some of her comments about the state of the medical record (R. 17), but the Plaintiff points out that Dr. Martinez ultimately declined to give an expert opinion at the hearing.  (R. 40.)  Second, the Plaintiff says that bias may be inferred from "the facts in this case which clearly show that [she] is severely limited by her neurocognitive disorder."  (*Id.* at 13.)  Third and relatedly, she argues that "[t]he fact that ALJ Merrill stopped the sequential evaluation process in this case at step 2 raises eyebrows and

demonstrates that he has acted in clear defiance of the regulatory guidelines followed by the vast majority of the ALJ's in the disability claims process." (*Id.* at 13.)

The Court concludes that none of these reasons support the unusual remedy of an order of reassignment.  With respect to the first issue, while it is true that Dr. Martinez declined to offer an expert opinion on the ultimate issues (R. 40), her hearing testimony was sufficiently close to the ALJ's description that it would be improper to attribute bias to him.  (*Compare* R. 17 (ALJ decision stating that Dr. Martinez testified about absence of records from 2013-2015; Dr. Caruso's reliance on the Plaintiff's self-reported history; and the lack of "acute" findings in the December 2015 MRI) *with* R. 64-65 (discussing state of record before October 2015); R. 65 (discussion between ALJ and Dr. Martinez regarding "no acute findings" in MRI).)  And with respect to the second issue, while the case is being remanded for a full sequential evaluation and further explication of the weights assigned to the opinion evidence, it cannot be said that the Plaintiff is clearly disabled. (*See* discussion, n.8 *infra.*)  And with respect to the third issue, while the Court will not sustain the ALJ's decision to stop at Step Two, neither will it attribute it to bias or hostility.  On remand, the Commissioner will decide whether the case is reassigned or stays with ALJ Merrill.

## IV.    <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, the Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 22) is **GRANTED  in part and DENIED IN PART.**  It is **GRANTED** to the extent that it seeks an order vacating the Commissioner's decision and remanding the case to the Commissioner for re-hearing after further development of the administrative record, but it is **DENIED** to the extent that it seeks an order reversing the decision and remanding the case solely

for an award and calculation of benefits.[5]  The Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 25) is **DENIED.**  Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is ordered **VACATED,** and the matter is ordered **REMANDED** to the Commissioner for a re-hearing after further development of the administrative record consistent with this opinion.

This is not a recommended ruling.  The parties consented to entry of a final judgment by a magistrate judge (ECF No. 10), and accordingly **the Clerk of the Court is directed to enter judgment in favor of the Plaintiff and close the case.**  Any appeal from the Court's judgment may be made directly to the appropriate United States Court of Appeals.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

/s/ Thomas O. Farrish
_____
Hon. Thomas O. Farrish
United States Magistrate Judge

---

[5]      To remand solely for calculation of benefits, the Court "must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'"  *Casanova v. Saul*, No. 3:19-cv-00886 (TOF), 2020 WL 4731352, at *2 (D. Conn. Aug. 14, 2020) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  The Court has examined the entire administrative record, and it finds no "persuasive proof" of the Plaintiff's disability.  Remand for calculation of benefits would therefore be inappropriate.